**RESTAURANT LUTECE, INC., Plaintiff,**

v.

**HOUBIGANT, INC., Defendant.**

**Civ. No. 84–2058.**

United States District Court,
D. New Jersey.

June 29, 1984.

Edward R. Weingram, Paramus, N.J., Stanley J. Yavner, Jay A. Bondell, Wolder, Gross & Yavner, New York City, for plaintiff.

Joseph J. Fleischman, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, Newark, N.J., M. James Spitzer, Ronald J. Offenkrantz, Spitzer & Feldman, New York City, for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is an action brought by plaintiff Restaurant Lutece, Inc. (Lutece) against defendant Houbigant, Inc. (Houbigant) for infringement of a federally registered trademark, for infringement of a common law trademark, for false designations of origin and false descriptions and representations in commerce under section 43(a) of the Lanham Act, for unfair competition and for dilution. This matter is presently before me on plaintiff's application for a preliminary injunction restraining defendant from distributing or offering for sale a new perfume called "Lutece", or otherwise using the term "Lutece" in an unauthorized manner.

As a preliminary matter, I note that in lieu of a factual hearing on this application, plaintiff has opted to rest on the affidavits and pleadings submitted. In opposing plaintiff's application, defendant has also opted to rely on its affidavits and pleadings.

From these papers, I find that, for the purposes of this application, the relevant facts are as follows:

Lutece is a small French restaurant located on East 50th Street in New York City. It has acquired a reputation among many gastronomes as perhaps the finest French restaurant in the United States. Its international standing is manifested by the many awards and favorable reviews it has received, some of which have been appended to plaintiff's papers. These include the Grand Award of Merit designation by Cuisine Extraordinaire; Traditions Et Qualite Designations 1967, 1968, 1982 and other years; the 1978 and 1979 Maitres-Cuisiniers de France Designation; Birnbaum, *USA for Business Travellers* (1984) ("Lutece—New York's (and perhap's this country's) finest French restaurant...."); *The American Express Pocket Guide to New York* (1984) ("Lutece is the standard against which any American restaurant that presumes to purvey *haute cuisine* must be measured."); Fodor, *New York City* (1984) ("Probably the most ambitious and elaborate French food served in the United States."); Mariani, *Critics' Choice: 25 Greatest Restaurants*, Playboy, June 1984 ("For the second time, Lutece stands solidly at the top of our list, far outscoring its nearest rival.")

The President/proprietor of Lutece, Andre Soltner, who has served as the chef for the restaurant, is one of the world's most highly honored chefs, having received, *inter alia*, recognition by L'Academie Culinaire de France. As the American Express guide to New York puts it, Mr. Soltner "is perhaps the only man in America that the great chefs of France acknowledge as their equal."

Lutece neither operates nor franchises any other restaurant, and it is not engaged in any business other than that related to the restaurant itself. Further, it has apparently never licensed the use of its name on products or services provided by others. Nonetheless, even with a capacity of less than thirty tables, plaintiff's business is substantial: in 1982 its sales totalled approximately two and one-half million dollars.

Lutece has expended substantial effort and money to produce and to market high quality food and alcoholic beverages. As a result, plaintiff's products and services are widely known to connoisseurs of fine food and dining. Plaintiff, through its principal Mr. Soltner, states that it "continually and diligently strives to maintain that reputation and quality" and that "the famous nature of plaintiff's mark is such that the use of such mark on any goods and with any services denotes, not only high quality, but tasteful expensive quality and luxury of the highest degree."

Plaintiff registered the work "Lutece" (stylized) as a service mark for "restaurant services in class 42" on April 12, 1977 in the United States Patent and Trademark Office. It subsequently sought and obtained, on January 11, 1983, registration of its name as a service mark for "cocktail lounge services and restaurant services featuring the sale of alcoholic beverages in class 42." It owns no other registrations.

Defendant Houbigant is a New Jersey corporation with its offices in Ridgefield, New Jersey and is the sister corporation of the oldest perfume manufacturer in France. Houbigant has announced plans to market, beginning in August, 1984, a line of cosmetics and fragrances (perfumes) to be called "Lutece." Houbigant's own trademark application covering goods in Class 51 (cosmetics and fragrances) is presently pending in the United States Patent and Trademark Office. Applications in foreign countries are also pending. Plaintiff has attached to its complaint as Exhibit V the pre-sale announcements for defendant's new line of perfumes. The first page of this announcement is headed "Lutece" and the text reads:

The Luxury Collection

The richness of gold and sapphires captured in a collection of jewel-like splendor. A fantasy flower with petals of gold is embossed on deepest sapphire, hinting of the fragrant luxury within.

The second page is also headed "Lutece" and the text reads:

The New Luxury Niche

Lutece is a marketing milestone luxurious in fragrance and presentation, it was created for the sophisticated, fashion-forward woman. She is the 'in-between woman' caught between her expensive desires and her young income. She seeks out luxuries that offer more. A niche was waiting and Houbigant has filled it. Lutece is an opulent concept in sapphire and gold. A fragrance collection of exceptional luxury.

According to James J. Bosek, Senior Executive Vice-President of Houbigant, the proposed Lutece line of perfume "is for the broad market seeking an attractive fragrance, beautifully presented, at a moderate price. The products will not be sold to or in those retail stores specializing in top-of-the line luxury priced fragrances...." Bosek states that defendant's marketing program essentially divide Houbigant products into two categories: those in the upper price range and those in the middle to lower price ranges. The former are sold on a limited distribution basis to stores that retail only the most expensive lines. Specifically, Houbigant sells two such lines under its Raffinee and Ciao trademarks to approximately 1,000–1,500 stores. The other product line, including Chantilly, are sold in the middle priced and mass markets to 8,000–10,000 department, drug and chain stores.

Approximately three years ago, according to Bosek, defendant decided to launch a new middle priced line of perfume, with the hope that it would stimulate sales in that market as successfully as defendant's Raffine line had in the "luxury" market.

When a French motif had been selected for this new line, consideration was given to selection of a name. An affidavit submitted by Ms. Margot Mallory, defendant's Vice-President for Advertising, details the name selection process. Additionally, attached as Exhibit A to this affidavit are copies of what Ms. Mallory states are all of her notes prepared for the ten name selection conferences held by defendant, including the date each memorandum was prepared, her suggested names, and in most cases, the meaning of the name (or whether the name had been made up). These notes, together with Ms. Mallory's affidavit, outline the course of this selection process over the period between June 8, 1982 and May 31, 1983, and reveal at least some of the rationale for or intent behind defendant's eventual choice of the name Lutece.

These documents show that several names other than Lutece were initially selected but were found to be unavailable for a variety of reasons, including registry in foreign countries. The name Lutece first appears on Ms. Mallory's list dated January 14, 1983 together with its Cassell's French dictionary definition of "ancient Paris." Although the name was rejected at that conference, Ms. Mallory again presented the name in her January 24, 1983 memorandum because she "personally thought the word had possibilities." This time, however, it was spelled "Lutesse", and once again it was rejected. The name reappears on her March 20, 1983 memorandum with the following note: "Suggest reconsidering the name Lutece the name for Paris in Roman times. We could spell it Lutesse if you wish. Because it is so hard to register any Paris word we should probably register this for the future even if we don't use it now." On March 31, 1983 a list of names was presented which did not include "Lutece", but Ms. Mallory states that she brought it up orally at the meeting and hand-wrote "Lutesse" at the bottom of her memorandum. This name was omitted from several subsequent lists "because it had not been favorably received." She again restored it to her list prepared for the meeting on May 18, 1983. At that meeting two names were selected: "Apercu" and "Lutece", in that order of priority. Tentative advertising concepts and layouts were blocked out for both names until in June it was ascertained that Apercu was not available for registration and the selection of Lutece was finalized. Ms. Mallory states unequivocally that "[t]here was no thought in my mind of any identification of the defendant's fragrance with plaintiff's restaurant. I knew of it just as I know of the restaurant 'Le Chantilly' which, as far as I am aware, has never caused confusion with or been tied into the defendant's trademark 'Chantilly' ...." She further states that "[i]f I had thought that the public or any significant part of it would connect defendant's fragrance line with plaintiff's restaurant, I would have regarded it as detrimental and would have removed the name from my various lists...."

On March 20, 1984, before any communication was received from plaintiff, defendant's management prepared a "Position Paper" for its new line of fragrance. This document, which is attached to the Bosek affidavit as Exhibit W clearly indicates that the Lutece line was targeted for a middle income market. After noting that "[p]ractically every top fashion designer has introduced a lower priced line that offers the 'look' and style of the designer at a more affordable price," the document states that "Lutece offers Paris-designed packaging and Paris-conceived fragrance at popular American prices." The document characterizes the target market as "The In-Between Woman", "caught between the many demands of the 'good life' and her young income."

Two days later, on March 22, 1984, defendant issued Sales Bulletin # H–10 captioned "Lutece—A New Houbigant Fragrance" to its sales force. A copy of this document is attached to the Bosek affidavit as Exhibit X. The Bulletin, in addition to confirming the nature of the target market for defendant's new line, informed its sales organization that, inter alia, more than $7,000,000 will be spent on advertising and

promotion for the Lutece line. The document also detailed specific sales promotion and merchandising aids available, including special items available for J.C. Penny and Sears stores.

The Bosek affidavit further states that, under defendant's current plans, a national advertising campaign will support the sales effort, with print advertising in magazines such as Cosmopolitan, Seventeen, Mademoiselle, Glamour, Vogue and Teen, as well as a variety of regional magazines, as well as major newspapers. Television campaigns are planned in some 35 major selling markets. Mr. Bosek states that the Lutece line has been and is being enthusiastically received by nearly 10,000 stores nationwide, and orders totalling approximately $9–10 million have been received and are in process. It is expected that for the fiscal year July 1, 1984–June 30, 1985 the sales of the Lutece line will be in the range of $15,000,000. Defendant has in stock the products comprising its Lutece line and intends to begin shipments late in July and in early August.

In May of 1984, defendant's agents contacted Dr. Robert C. Sorenson, a noted specialist in the field of market surveying. At defendant's request, Dr. Sorenson designed and conducted a survey for the purpose of ascertaining the perception of likely consumers as to the origin of defendant's Lutece line of perfume, the recognition factor or association of the name "Lutece" with plaintiff, and the extent, if any, of actual confusion or the likelihood of confusion of defendant's Lutece line with the name of plaintiff's restaurant. Six hundred interviews were completed for this survey, one hundred at a shopping center in each of six metropolitan areas: Long Island, New York; Syracuse, New York; Buffalo, New York; Eatontown, New Jersey; Kansas City, Missouri; and Dallas, Texas. The universe of women from whom this random intercept sample was selected consisted of women 21 years of age or older who resided in the general area in which the interview took place and who had used fragrance products one or more times in the six months prior to the interview. Dr. Sorenson's affidavit indicates that his findings from the survey are as follows:

"(a) Of the six hundred women 21 years of age and over who have used fragrance products during the past six months, 39.5% correctly identify the source of two Houbigant LUTECE fragrance products they have been shown—eau de cologne spray and dusting powder—as being Houbigant.[*] An additional 2.1% identify the source as being the same source as Chantilly, a Houbigant trademarked product. This brings the total of 41.6%. Parenthetically, in New Jersey, the percentages are even higher.

(b) 6.2% of all respondents (approximately 36 people out of the 600) make an incorrect attribution of source. Included in those 36 respondents are those who refer to Avon, Revlon, Max Factor, and Estee Lauder. One person out of the 600 (0.2%) identifies the source of the LUTECE line simply as "LUTECE". The fact that only one individual named LUTECE as the source, given its display on the box and container demonstrates that consumers easily distinguish between the company source and the brand name.

(c) Of total respondents, no one (0%) associates the Lutece restaurant in a business sense with the Houbigant Company and/or its LUTECE line of fragrance products.

(d) Of total respondents 20 people (3.3%) are aware of another product, service or establishment bearing the same name as, or similar to, the name LUTECE and, when questioned, refer to another fragrance, spray, or said: "Don't know." Eight people out of the 20 (or 1.3% of the total 600 respondents) assert that they are aware of a restaurant bearing the name Lutece but no one attributes the Houbigant LUTECE product to the Lutece Restaurant. In the New Jersey survey there is only one person

---

[*] The main reason given for the Houbigant source identification is that it says so on the box or container.

who indicates she knows of the restaurante while she nonetheless identifies Houbigant as the source of the fragrance line."

Based on these findings, Dr. Sorenson concludes that:

"15. Accordingly, it is my professional opinion that there is no reasonable likelihood of confusion of the Houbigant LUTECE fragrance product line with the Lutece restaurant on the part of women fragrance product users in several parts of the United States when they are shown boxes and containers of Houbigant's LUTECE line of fragrance products.

16. Moreover, I conclude that few women in any metropolitan area, including Long Island and/or Monmouth County, New Jersey are independently aware of a restaurant named Lutece.

17. Moreover, it is my conclusion that, regardless of the knowledge or lack of knowledge of any restaurant named Lutece, almost no woman fragrance product user makes any business association between Houbigant's LUTECE products and the Lutece restaurant. Thus, regardless of whatever secondary meaning exists for the word Lutece when joined with the word restaurant, the word Lutece does not otherwise signify a restaurant to the great majority of women fragrance product consumers with whom we spoke.

18. Finally, it is my conclusion that the results of this study, given their preponderance and the objectivity of this study's questions, will very likely not be contradicted in any significant way were all members of this same population interviewed throughout the United States."

While Dr. Sorenson did not testify on the stand as to his survey, and while plaintiff has submitted an affidavit of Prof. Henry Assael criticizing Dr. Sorenson's methodology and techniques, nonetheless I find Dr. Sorenson's survey results to be generally reliable and indicative of the likelihood for actual confusion in defendant's target market, as well as of the relationship of the goods in the minds of consumers in this market.

Based on what plaintiff views as the unfairness of defendant's use of the name Lutece for its new line of fragrances and the likelihood of injury to plaintiff's business as a result, plaintiff now seeks a preliminary injunction enjoining defendant from any unauthorized use of the term Lutece, or any term confusingly similar thereto, or otherwise unfairly competing with plaintiff or interfering with plaintiff's business.

In several recent cases, the Third Circuit has clarified the standards governing the grant or denial of injunctive relief in federal trademark actions where plaintiff and defendant deal in non-competing lines of goods or services. As Judge Hunter recently stated in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir.1983):

> The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion. Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark. To determine likelihood of confusion where the plaintiff and defendant deal in non-competing lines of goods or services, the court must look beyond the trademark to the nature of the products themselves, and to the context in which they are marketed and sold. The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion. *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir.1976). Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief. 15 U.S.C. § 1114(1) (1976).

715 F.2d at 462.

Judge Hunter further noted that the test for injunctive relief in such circumstances

was restated somewhat differently by the Third Circuit in *Scott Paper Company v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978). Rather than focusing on likelihood of confusion, Judge Rosenn in that case inquired as to whether the plaintiff's mark for its non-competing product had developed a "secondary meaning" in the defendant's market. Because, however, the evidence required to show either likelihood of confusion or secondary meaning as well as the legal consequences flowing from a finding of either "will be virtually indistinguishable," Judge Hunter in *Interpace* concluded that "[t]he test we stated in *Scott Paper* is thus indistinguishable in practice from the more traditionally phrased likelihood of confusion test." 721 F.2d at 462.

The Third Circuit in *Interpace* and *Scott Paper* identified ten factors to aid in determining likelihood of confusion in non-competing products cases such as this. These factors are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

721 F.2d at 463; 589 F.2d at 1229.

Of course, with regard to applications for preliminary injunctive relief the criteria enunciated by the Third Circuit in *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137 (3d Cir.1982) are applicable. Specifically, the moving party must show (1) a reasonable probability of eventual success on the merits; (2) that the movant will be irreparably injured *pendent lite* if relief is not granted. As Judge Garth noted in the *Arthur Treacher's* opinion, a failure to show either of these two essential elements "must necessarily result in the denial of a preliminary injunction." *Id.* at 1143. Moreover, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Id.*, quoting *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975). *Accord, Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982) (en banc); *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

█ Applying these standards to the facts before me, I find that plaintiff has failed to demonstrate a likelihood of success on the merits as measured by the tests outlined in *Interpace* and *Scott Paper*. Specifically, I find that plaintiff has not met its burden of showing a probability of eventually proving either a likelihood of confusion in the minds of consumers as a result of defendant's use of the term Lutece as the name for its new line of fragrances, or that plaintiff's use of that term has developed a "secondary meaning" in defendant's market.

An examination of each of the ten factors set forth in *Interpace* and *Scott Paper* on balance supports this finding. First, it is essentially uncontested that there is a high degree of similarity between plaintiff's mark and the allegedly infringing mark. Both parties use the term Lutece by itself, and both make use of an "accent grave" over the first "e". While plaintiff's registration is for a stylized form of the word, I cannot find that this in and of itself creates a dissimilarity between the two uses. Accordingly, this first factor supports plaintiff's position. It should be not-

ed, however, that defendant's packaging will include the name Houbigant as well as the name Lutece, and that this will somewhat limit the similarity.

Second, as to the strength of plaintiff's mark, I find that plaintiff has demonstrated its strength only in a limited segment of the population. From the proofs thus far submitted, it appears that the strength of plaintiff's mark is dichotomous in nature: among those whose income and taste is such as to permit them to appreciate haute cuisine, and particularly among those who live in or frequently visit New York City, plaintiff's restaurant and its mark are well known. The term "Lutece" is, for them, likely to be synonomous with "outstanding French food." There is insufficient evidence, however, that the rest of the country would remember having heard of plaintiff's restaurant. For example, Dr. Sorenson's survey suggests that only approximately 1% of women fragrance users in metropolitan shopping centers are even aware of a restaurant named Lutece. Thus, while plaintiff's mark is extremely strong among a small and perhaps generally highly affluent group, the mark is otherwise weak.

The third factor is the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase. Here, while defendant's new line of fragrances will not be the most expensive on the market, neither will it be inexpensive. With recommended prices ranging from $7.50 for one-half ounce of "Eau de Parfum Spray" to $35.00 for one-fourth ounce of "Perfume", defendant's products will not, in most instances, be purchased on impulse or whim. Salespersons may often become involved, directly or indirectly advising potential customers as to the source of the products. (The latter may occur if such potential customers are made aware of other Houbigant products, which will be displayed adjacently, or are helped to see the Houbigant name on the package.) On the other hand, to the extent it is relevant, there can be little doubt that plaintiff's customers exercise substantial care and attention when

making a purchase of plaintiff's goods and services. These customers are concededly sophisticated and demanding in this regard, and certainly plaintiff's prices are reflective of this fact.

The fourth factor has little bearing here because defendant's new line has yet to be introduced. Thus the length of time defendant has used the mark *without* evidence of actual confusion arising is the same as the length of time defendant has used the mark *with* evidence of such actual confusion.

The fifth factor is the intent of defendant in adopting the mark. Given that the decision to name defendant's new fragrance line "Lutece" was made by defendant's corporate executives who all work and presumably reside in the metropolitan New York area, it is very likely that all of them had heard of plaintiff. I am, however, convinced by the Mallory and Bosek affidavits that defendant's agents made that decision "in spite of" rather than "because of" plaintiff's use of the name. Ms. Mallory's good faith explanation for the selection of the name clearly suggests that it was chosen for its French sound and Parisian connection rather than to take advantage of plaintiff's goodwill. *See, e.g., Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1363 (E.D.Pa.1972), *aff'd without opinion*, 480 F.2d 917 (3d Cir.1973).

The sixth factor is the evidence of actual confusion. Here again direct evidence on this issue is unavailable because defendant's new line is not scheduled for release until August or September of 1984. There is, nonetheless, other evidence which suggests the absence of actual confusion. In addition to the survey of Dr. Sorenson (which concludes that there is little or no risk of such actual confusion) this evidence consists of the non-exclusive nature of plaintiff's use of the term "Lutece". In the United States, for example, Brasserie Nouvell de Lutece, the French brewer of Lutece beer has filed a petition in the United States Patent and Trademark Office on

April 7, 1982 to register its mark. This application has been approved by the Office and will be published in the Official Gazette on July 24, 1984. Defendant has submitted a reference to a New York Times article indicating the current availability of the beer in a local restaurant. Further, defendant has supplied copies of advertisements in the New York Times by an organization called Editions d'Art de Lutece (Lutece Art Editions) offering for sale signed limited editions of Salvatore Dali sculptures. Haviland & Co., Inc., a popular manufacturer of fine table china, sells an entire pattern of its china under the name "Lutece". Defendants have also submitted the certificate of incorporation of Lutece Imports, Ltd., a manufacturer and seller of ladies' garments, as well as that of The Lutece Foundation, a non-for-profit foundation. Finally, the parties have entered into a stipulation agreeing that if Jo Ann Acosta had been called to testify on the date of the hearing on this application, she would testify as follows:

I am employed by Houbigant, Inc., the defendant above-named, in the capacity of Manager Sales Services. On Tuesday, June 12, 1984, in the Housewares Department on the second floor in Bloomingdale's Department Store located at Riverside Square Mall, Hackensack, New Jersey, I purchased a 20 piece dinnerware service set, Exhibit A hereto, sold under the trademark "Lutece". There was a large stock of that particular item on the sales floor under a sign which stated Lutece Dinnerware, showing the regular price and the sale price of $25 which is the sum that I paid to make the purchase.

In addition, defendant has submitted numerous uses of the name Lutece in France, such as in the names of hotels, restaurants, an insurance company, and other similar examples. *See* Bosek affidavit at 12–14. The absence of any evidence of actual confusion in the face of these many and varied additional uses for the name Lutece is supportive of defendant's position.

The seventh factor is whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. This factor also weighs heavily in favor of defendant. Plaintiff apparently spends no money on advertising, and little if any on what is normally considered "marketing". Instead it relies primarily on restaurant reviews, "word of mouth" and repeat business for its customers. Defendant, in contrast, plans a substantial advertising and marketing campaign, relying on print advertisements in national women's magazines and newspapers, broadcast advertisements on television, and aggressive sales promotion efforts at department stores and other retail outlets. Thus little if any overlap can be expected to occur.

The eighth factor, the extent to which the targets of the parties' sales efforts are the same, provides additional support for defendant. As previously indicated, plaintiff's target market is relatively small, geographically limited and, by necessity, highly affluent. Defendant's efforts will be directed at a large, nation-wide (and perhaps international) market consisting of fashion-conscious but generally middle- to moderate-income women. Houbigant's own projections call for sales to as many as one million women in the first year after release of the Lutece line. The line will be distributed to 9,500–10,000 retail stores, including Abraham & Strauss, J.C. Penny, Sears, Roebuck, Montgomery-Ward, Peoples Drug Stores, Pay 'N' Save Drug Stores and Gimbel's. Clearly there will be little or no overlap between these target markets.

The ninth factor is the relationship of the goods in the minds of consumers because of the similarity of function. No evidence on this issue has been presented. While an argument could be made that gourmet foods and perfumes are somehow linked in the minds of consumers as luxuries or as self-indulgence, I decline to make such an assumption.

The tenth and final factor is "other facts suggesting that the consuming public

might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." *Interpace*, 721 F.2d at 463. As Judge Hunter stated in *Interpace*, this "likelihood-of-expansion factor is pivotal in non-competing products cases...." *Id.* at 464. Here it does not appear likely that plaintiff will soon enter the fragrance field, or that the consuming public would expect it to do so. Plaintiff's sole business consists of the operation of is single restaurant in New York City. It neither engages in other lines of business, nor licenses the use of its name to others thus engaged. It has never even announced an intention to branch out or "diversify". If anything, recent published interviews with Mr. Soltner suggest an intention to adhere to the status quo. *See* USA Today, Oct. 4, 1983 at 2B, col. 6, attached to Supplemental Declaration of Andre Soltner as Exhibit J.

Considering these factors as a whole, I find that the facts point clearly to a conclusion that the plaintiff has demonstrated neither that defendant's use of the Lutece name is likely to cause confusion nor that plaintiff's name had developed "secondary meaning" in defendant's market.

I further conclude that plaintiff has not adequately demonstrated a likelihood of success on the merits of its New York State statutory or common law claims. Plaintiff's state law trademark and dilution claims, premised on both Section 368–d of the New York General Business Law and the common law, require that it establish that it possesses a name which is "truly of a distinctive quality" or one which has "acquired a secondary meaning in the minds of the public." *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621 (2d Cir.1983). A mere showing of "strength" is, under the statute, insufficient. *Id.*, citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Further, a plaintiff must also demonstrate "likelihood of dilution" in order to establish its claim, meaning that defendant's use would blur a product's identification or tarnish an affirmative association that plaintiff's mark has come to convey. *Sally Gee, Inc.*, 699 F.2d 625. For the reasons previously discussed, it is clear that plaintiff has not met these standards. *See, e.g., Schoenfeld Industries, Inc. v. Britannia Sales, Ltd.*, 512 F.Supp. 979 (S.D.N.Y.1981) (sophistication of buyers relevant to state law dilution claim).

Because plaintiff has failed to demonstrate a likelihood of success on the merits as to its federal or state law claims, I need not reach the other elements which are properly considered in the grant or denial of preliminary injunctive relief. Nevertheless, I find that neither consideration of the possibility of harm to other interested persons nor of the public interest, supports plaintiff's application. In particular, it is obvious that granting plaintiff the relief it seeks would seriously and adversely affect the many retail stores that have ordered defendant's new fragrance line.

For all of these reasons, I have determined to deny plaintiff's application for preliminary injunctive relief. An order in conformance with this opinion has been filed by the court.