Argued and submitted October 5, 1982, affirmed February 15, 1983

# WEDGWOOD HOMES, INC. et al,
*Respondents on Review,*

*v.*

# LUND,
*Petitioner on Review.*

(TC 40-069, CA A20839, SC 28880)

659 P2d 377

Dennis E. Stenzel, Portland, argued the cause for petitioner on review. With him on the briefs was Chernoff & Vilhauer, Portland.

Milton C. Lankton, Portland, argued the cause for respondents on review. With him on the brief was Black, Kendall, Tremaine, Booth & Higgins, Portland.

ROBERTS, J.

## ROBERTS, J.

This case presents for our consideration the extent of protection of trademarks and names provided by ORS 647.107, Oregon's antidilution statute. The statute provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under ORS 647.015, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

■ ■ Plaintiff, Wedgwood Homes of Portland, Inc., and its wholly owned subsidiary, Wedgwood Homes, Inc., sought to enjoin defendant from using "Wedgwood" in its assumed business names, Wedgwood Downs and Wedgwood Place. At trial plaintiff attempted to prove common law unfair competition as well as dilution of its trade name pursuant to ORS 647.107. We accept the facts as found by the trial court and Court of Appeals. Plaintiff has failed to show a likelihood of consumer confusion of the identities of plaintiff and defendant.[1] Its cause of action for unfair competition therefore fails. The trial court nonetheless granted an injunction finding a likelihood of injury to business reputation or dilution of the distinctive quality of plaintiff's name under the statute. The Court of Appeals affirmed. We review to determine if there was "dilution" of the "distinctive quality" of plaintiff's name. The statute does not define either term. Neither this court nor the Court of Appeals has had occasion to construe the statute. *See Frostig v. Saga Enterprises, Inc.,* 272 Or 565, 570, 539 P2d 154 (1975); *Western Bank v. Western Bancorporation,* 47 Or App 191, 194 n. 2, 617 P2d 258 (1980).

"Distinctive" is a term often used in the common law of trademarks. To qualify as a trademark a symbol must be "so distinctive that it is capable of performing the function of identifying and distinguishing the goods which bear the symbol." 1 J. McCarthy, Trademarks and Unfair

---

[1] Although it lies within our discretion to review this case anew upon the record, ORS 19.125(4), we do not do so. Our holding is based on the facts found by the trial court and Court of Appeals.

Competition § 3:1 (1973). Marks are considered distinctive if they comprise coined words invented for the sole purpose of identifying a product[2] or if they are arbitrary marks, existing words applied to a product in an unexpected and nondescriptive fashion.[3] *Id.* §§ 11:2, 11:3. A mark may also become distinctive by acquiring a secondary meaning, that is, by taking on "a special significance to the public so that a substantial number of present or prospective patrons * * * understand the designation when used in connection with [plaintiff's] business 'not in its primary lexicographical sense, but as referring to a particular person or association.' 3 Restatement of Torts § 716, Comment b, p. 560 (1938)." *Frostig v. Saga Enterprises, Inc., supra,* 272 Or at 570. A secondary meaning is acquired "when the name and the business become synonymous in the public mind; and submerges the primary meaning of the name * * * in favor of its meaning as a word identifying that business." *Visser v. Macres,* 214 Cal App 2d 249, 253, 29 Cal Rptr 367, 369 (1963).

Some marks, such as generic terms,[4] are considered inherently nondistinctive in a trademark sense because by naming the product itself they are incapable of identifying the originator of the goods. McCarthy, *supra* §§ 3:1, 12:1.

We realize that the distinctiveness adequate to identify the origin of a product may be different from the distinctive quality deserving of protection from dilution. To this extent, the fact that a plaintiff may possess a distinctive tradename only begins our inquiry. The meaning of "distinctive quality" must take shape within the confines of the interests sought to be protected by the antidilution statute.

---

[2] Examples of coined marks include Polaroid, *Polaroid Corporation v. Polaraid, Inc.,* 319 F2d 830 (7th Cir 1963) and Kodak, *Eastman Kodak Co. v. Weil,* 137 Misc 506, 243 NYS 319 (1930).

[3] An example of an arbitrary mark is V-8 for a drink made from the juice of eight vegetables, *Standard Brands, Inc. v. Smidler,* 151 F2d 34 (2d Cir 1945).

[4] Generic labeling has become familiar for such products as beer and cigarettes. Once-distinctive trademarks may also become generic through popular use. Such marks include thermos, a vacuum-insulated container, *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F2d 577 (2d Cir 1963); jujubes, candy, *Henry Heide, Incorporated v. George Ziegler Company,* 354 F2d 574 (7th Cir 1965); and yo-yo, a return top on a string, *Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co.,* 343 F2d 655 (7th Cir 1965).

Traditionally, trademarks were the method by which the public identified a product's source.[5] In modern times, trademarks have assumed a marketing function:

"The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same — to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." *Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co.,* 316 US 203, 205, 62 S Ct 1022, 86 LEd 1381 (1942).

■ The antidilution statutes[6] developed out of the growing recognition that trademarks now surpass the

---

[5] "The modern trademark has two historical roots: (1) the proprietary mark, which was optionally but usually affixed to goods by the owner, either for the benefit of illiterate clerks or in order that in case of shipwreck or piracy the goods might be identified and reclaimed by the owner. This mark was essentially a merchant's rather than a craftsman's mark and had nothing to do with the source of production of the goods in question. (2) The regulatory production mark, which was compulsorily affixed to goods by statute, administrative order or municipal or gild regulation, so that defective work might be traced to guilty craftsman and heavily punished, or that 'foreign' goods smuggled into an area over which a gild had a monopoly might be discovered and confiscated. This mark was a true mark of origin, designating as it did the actual producer of the goods." Schechter, *The Rational Basis of Trademark Protection,* 40 Harv L Rev 813, 814 (1926-27).

[6] Massachusettes enacted the first antidilution statute in 1947. Act of May 2, 1947, ch. 307, § 7a, 1947 Mass Acts 300 (current version at Mass Gen Laws Ann ch. 110B, § 12 (West 1982-83)). Since then 19 other states have enacted such statutes. Most of them, like Oregon, have adopted the language of the Model State Trademark Bill. *See* Ala Code § 8-12-17 (1980); Ark Stat Ann § 70-550 (1979); Cal Bus § Prof Code § 14330 (West 1982); Conn Gen Stat § 35-11i(c) (1981); Del Code Ann tit. 6, § 3313 (1980); Fla Stat Ann § 495.151 (West 1972); Ga Code Ann § 106-115 (1968); Idaho Code § 48-512 (1977); Ill Ann Stat ch 140, § 22 (1982-83); Iowa Code Ann § 548.11(2) (1982-83); Me Rev Stat Ann tit 10, § 1530 (1980); Mo Ann Stat § 417.061 (1) (Vernon 1979); Neb Rev Stat § 87-122 (1981); NH Rev Stat Ann § 350-A:12 (1981); NM Stat Ann § 57-3-10 (1978); NY Gen Bus Law § 368-d (McKinney 1968); ORS 647.107 (1981); RI Gen Laws § 6-2-12 (1982); Tenn Code Ann § 69-521 (1982) (repealed eff 1983).

traditional identity role. "[T]he trademark functions on three different levels — as an indication of origin or ownership, as a guarantee of constancy, and as a medium of advertisement." 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 65 (3d ed 1969). A mark may possess independent protectible value to the extent that it acquires advertising and selling power.

In the context of dilution, the protectible quality of a mark has been defined as the mark's power to evoke images of the product, that is, its favorable associational value in the minds of consumers. This attribute may be developed in a variety of ways: long use, consistent superior quality instilling consumer satisfaction, extensive advertising. Note, *Dilution: Trademark Infringement or Will-O'-The-Wisp?* 77 Harv L Rev 520, 522 (1963/64); Recent Developments, 46 Fordham L Rev 1315, 1333-35 (1978).

In application the existence of the mark's distinctive quality must be proven by demonstrating what the mark signifies to the consuming public, *Id.* at 1335. If the mark has come to signify plaintiff's product in the minds of a significant portion of consumers and if the mark evokes favorable images of plaintiff or its product it possesses the distinctive quality of advertising value — consumer recognition, association and acceptance, — and will be entitled to protection from dilution.

Plaintiff has been engaged for the past 25 years in the development, construction and marketing of single and multiple family residential real estate in eastern Washington County. Plaintiff's substantial advertising programs seek to promote the quality, styling and flair of plaintiff's residential construction. Defendant has maintained dormitory style housing for the elderly in two retirement apartment complexes in eastern Washington County since 1977.

The trial court found that after 25 years' use plaintiff had established a secondary meaning in its name. Defendant does not dispute this conclusion but argues that the antidilution statute should be limited to marks which are coined, unique or truly famous. Relying on legislative history defendant contends that only the most distinctive marks deserve the enhanced protection afforded by ORS

647.107, and that because plaintiff's name is neither coined, unique nor nationally famous the statute should not be invoked on plaintiff's behalf.

■    We reject defendant's argument that the protection of the antidilution statute should apply to coined and unique[7] words alone. As we have noted, marks may become distinctive in three ways: by use of coined words, by use of arbitrary words, or by acquisition of secondary meaning.

In light of the nature of the distinctive quality we have defined there is no reason to assume, as defendant's argument implies, that only coined marks possess advertising value. When first coined a mark will likely have no commercial value at all.[8] Distinctive quality develops over time as consumer recognition and association is instilled. Moreover, defendant cannot dispute that a mark which has become distinctive through the acquisition of secondary meaning could be entitled to protection from dilution. Among examples of marks covered by the statute is Tiffany, a jewelry trademark, which acquired its distinctiveness through secondary meaning. *Tiffany & Co. v. Boston Club, Inc.,* 231 F Supp 836 (D Mass 1964).[9] It is our opinion that protection may be extended regardless of the manner by which a trademark becomes distinctive. *See Ferrara v. Scharf,* 466 F Supp 125 (SD NY 1979); *Great*

---

[7] It is unclear what defendant means by unique words. From the context in which it is used we assume they are intended to be the same as coined words.

[8] As one commentator has observed:

"When Kodak was first coined, its distinctive quality, if any, was entirely abstract and without a commercial significance that could be damaged. When first coined, but as yet unused, Kodak was neither entitled to any legal protection against dilution, nor was it then entitled even to traditional protection against likelihood of confusion. Until used, and until some identifying significance was thereby engendered in the state of mind of some consumers, nothing existed which could be damaged. Similarly, until Kodak acquired some distinctive identifying significance through some use, damaging dilution of any *commercially existing* distinctive quality was not possible." Pattishall, *The Dilution Rationale for Trademark - Trade Identity Protection, Its Progress and Prospects,* 71 NW U L Rev 618, 631 (1976/77). (Emphasis in original.)

[9] Defendant, relying on legislative history, asserts that only "truly famous" names such as Tiffany are entitled to antidilution protection. Tiffany was among the trademarks referenced during hearings before enactment of the antidilution statute as an example of a name to be protected by the antidilution statute. Or Sen Jud Comm. Minutes, April 7, 1971 at 2; Oregon House Judiciary Subcommittee Minutes, February 18, 1971 at 3.

*Scott Food Market Inc. v. Sunderland Wonder Inc.,* 348 Mass 320, 324, 203 NE2d 376, 379 (1965); *Skil Corporation v. Barnet,* 337 Mass 485, 491, 150 NE2d 551, 555 (1958).

■ Likewise, we reject defendant's suggestion that the statute be limited to nationally famous marks. We see no reason why marks of national renown should enjoy protection while local marks should not. A small local firm may expend efforts and money proportionately as great as those of a large firm in order to establish its mark's distinctive quality. In both situations the interest to be protected and the damage to be prevented are the same. In summary, it is not the manner by which distinctiveness is acquired nor the span of a mark's notoriety but rather the degree of advertising value the mark has gained which determines the applicability of ORS 647.107.

■ At trial plaintiff demonstrated, by means of survey evidence, a high association between the words "Wedgwood" and "Homes" in the minds of consumers. Plaintiff has established that its name, Wedgwood, evokes its product, homes, in the minds of a large portion of the public where it does business. Plaintiff further showed that such an association was a positive one. The trial court observed, "Wedgwood Homes is a well recognized name in [eastern Washington County] which approaches a high degree of local fame." We recognize that this association has commercial value to plaintiff. For purposes of the antidilution statute plaintiff has demonstrated that its name possesses distinctive quality.

We must now resolve what dilution is and whether it occurred or was likely to occur in this case.

■ In *Pignons S.A. de Mecanique de Precision v. Polaroid Corporation,* 657 F2d 482, 494-95 (1st Cir 1981), the court illustrated the three situations where dilution may arise. The term may refer to injury to the value of the mark caused by actual or potential consumer confusion. It may also be applied to injury caused by use which detracts from the reputation associated with plaintiff's mark. Finally it may encompass any diminution in the uniqueness and individuality of the mark resulting from defendant's use of a similar mark.

The first definition is inapplicable because our statute recognizes an action for dilution "notwithstanding the absence of confusion as to the source of goods or services."

■    An action for potential detraction from or tarnishment of the reputation associated with plaintiff's mark may be recognized in our statute as "likelihood of injury to business reputation" or it may be encompassed within the meaning of dilution. We need not address that issue here. Although plaintiff attempted to show unfavorable associations cast upon its product's reputation by what plaintiff characterized as the inferior construction and design of defendant's buildings, the trial court found that such unfavorable associations were not proven.[10]

■    We are left, then, with the third definition of dilution, a diminution in the uniqueness and individuality of the mark caused by another's use of the same or similar mark. We must consider whether a form of dilution is cognizable which does not depend on the relative quality of defendant's product or the undesirability of its association with plaintiff's product. We are persuaded that it is.

Where tradename owners have created a favorable association between their name and their product, they possess a valuable marketing tool. This aura of recognition enhances the value of plaintiff's name. Subsequent use of the name with a nonrelated product broadens the associations linking name and product in the minds of consumers of plaintiff's product and diminishes the specific association plaintiff seeks to foster. "[U]nrelated use erodes selling power by destroying the automatic identification of the

---

[10] We recognize that unfavorable associations may be enjoined. For example, in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F2d 200 (2d Cir 1979) plaintiff successfully enjoined a pornographic film depicting performers in the costume of its cheerleaders. The court reasoned that it would be "hard to believe that anyone who had seen defendants' sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders. This association results in confusion which has a 'tendency to impugn [plaintiff's services] and injure plaintiff's business reputation * * *,'" 604 F2d at 205, citing *Coca-Cola Company v. Gemini Rising, Inc.*, 346 F.Supp 1183, 1189 (EDNY 1972). In *Chemical Corp. of America v. Anheuser-Busch, Inc.*, 306 F2d 433, 437 (5th Cir 1962), *cert denied* 372 US 965, 83 S Ct 1089, 10 LEd 2d 129 (1963), an insecticide manufacturer's slogan "where there's life — there's bugs" was held to create "a peculiarly unwholesome association of ideas" with plaintiff's slogan "where there's life — there's Bud."

trademark with the original product and the favorable images created by advertising." Greiwe, *Antidilution Statutes: A New Attack on Comparative Advertising,* 72 Trademark Rep 178, 186 (1982). A second use may therefore be prevented by means of the antidilution statute.

We are aware of instances of judicial reluctance to apply antidilution statutes literally. Some courts refuse to issue injunctive relief because likelihood of confusion is not present, despite statutory language to the contrary. *See Berlitz Schools of Languages of America v. Everest House,* 619 F2d 211, 215 (2d Cir 1980); *HMH Publishing Co., Inc. v. Lambert,* 482 F2d 595, 599 (9th Cir 1973); *Carter-Wallace, Inc. v. Procter & Gamble Company,* 434 F2d 794, 803 (9th Cir 1970). Other courts have refused to apply the statute where confusion exists, *President & Trustees of Colby College v. Colby College - N.H.,* 374 F Supp 1141, 1143 (D NH 1974), *vacated on other grounds* 508 F2d 804 (1st Cir 1975); *Edgewater Apts. Corp. v. Edgewater Beach Mngm't Co.,* 12 Ill App 3d 526, 534, 299 NE2d 548, 554 (1973), or where competition exists, *Filter Dynamics Int'l, Inc. v. Astron Buttery, Inc.,* 19 Ill App 3d 299, 314-15, 311 NE2d 386, 398-99 (1974).[11] We are persuaded, however, in light of the interest sought to be protected by the law and the very language of the statute, that ORS 647.107 protects this plaintiff's tradename.

*Allied Maintenance Corporation v. Allied Mechanical Trades, Inc.,* 42 NY2d 538, 542, 399 NYS2d 628, 630, 369 NE2d 1162, 1164 (1977), defined dilution as "the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." The court distinguished the rationale for the dilution statute from the common law actions of trademark infringement and unfair competition:

> "The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name. * * *

---

[11] Much of the law in this area has been formed in the federal courts. We note that *a federal court's interpretation of state law may be persuasive but it is not* controlling.

The harm that section 368-d [the New York antidilution statute] is designed to prevent is the gradual whittling away of a firm's distinctive trade-mark or name." 42 NY2d at 544, 399 NYS2d at 632, 369 NE2d at 1165-66.

In *R. G. Barry Corp. v. Mushroom Makers, Inc.,* 108 Misc 2d 113, 436 NYS2d 927, 931, *aff'd* 85 AD2d 544, 444 NYS2d 922 (1981), the court in denying defendant's summary judgment motion in opposition to plaintiff's antidilution claim observed:

"Justice Felix Frankfurter termed the result of association of a name with a product through use and advertising 'commercial magnetism.' *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 US 203, 205, 62 S Ct 1022, 1024, 86 LED 1381. The anti-dilution statute was designed to prevent poaching on that commercial value of a distinctive trademark."

In *Augusta National, Inc. v. Northwestern Mutual Life Ins. Co.,* 193 USPQ 210 (SD Ga 1976), the court explained how dilution would occur if defendant were permitted to use "Masters" in its golf tournament "Ladies Masters at Moss Creek Plantation." "If the suspect name is used there is reasonable certainty that the value of plaintiff's mark will be eroded; a little now, more later, until the 'magic' of the Masters [Golf Tournament] will be mortally dissipated if not completely dispelled." 193 USPQ at 222.

■ We hold that where a tradename possesses the distinctive quality of favorable associational value a second use may be enjoined under the statute whenever this is proven to be necessary in order to prevent the diminution of plaintiff's name as an advertising tool among consumers of plaintiff's product. In the case before us plaintiff has established that its name possesses the distinctive quality of positive associational value with its product. To a significant percentage of the consuming public of eastern Washington County, Wedgwood connotes homes. Defendant's use of the name in connection with retirement apartments expands the associations consumers are likely to connect with the name and thereby reduces the name's effectiveness in identifying and advertising plaintiff's product. On these facts plaintiff has adequately demonstrated dilution of the distinctive quality of its name.

The decision of the Court of Appeals is affirmed.[12]

---

[12] Defendant requests modification of the decree as an alternative to reversal. Defendant suggests that a disclaimer of affiliation with plaintiff would provide adequate relief. In light of the detrimental impact any second use could have on the advertising value of plaintiff's name, injunction is the appropriate remedy.