**INTERSTELLAR STARSHIP SERVICES, Plaintiff,**

v.

**EPIX INCORPORATED, an Illinois corporation, Defendant.**

**No. CIV. 97–107–JO.**

United States District Court, D. Oregon.

Jan. 3, 2001.

Michael M. Ratoza, Michael Dell Long, Laura Caldera Taylor, Ratoza Long, Lynn S. Walsh, Portland, OR, for Plaintiff.

Peter E. Heuser, Stephen F. Gass, Kolisch Hartwell Dickinson McCormack & Heuser, Portland, OR, Sheldon L. Epstein, Law Office of Sheldon L. Epstein, Wilmette, IL, for Defendant.

### OPINION AND ORDER
ROBERT E. JONES, District Judge.

Interstellar Starship, Inc. ("plaintiff"), an Oregon corporation, brings this action against Epix, Inc. ("defendant"), a Delaware corporation with its principal place of business in Buffalo Grove, Illinois, seeking a declaration that plaintiff's use of the Internet domain name "epix.com" does not infringe upon defendant's registered trademark, "EPIX". Defendant brings counterclaims against plaintiff and its sole owner and officer, Mr. Michael Tchou ("Tchou"), alleging federal trademark infringement (15 U.S.C. § 1114), unfair competition (15 U.S.C. § 1125(a)), Oregon trademark dilution (ORS 647.107 and under the common law), Oregon trademark infringement (ORS 647.095 and under the common law), and cybersquatting (15 U.S.C. § 1125(d)). A bench trial was held December 15, 18 and 19, 2000. The court took the matter under advisement. For the reasons below, the court finds for plaintiff in part and for defendant in part.

### BACKGROUND [1]

This case was filed January 21, 1997. Both sides moved for summary judgment on the sole issue of whether plaintiff's use of "epix.com" infringed on defendant's trademark. The court found no evidence of actual confusion and no evidence of bad faith on the part of plaintiff. The court also found that plaintiff did not use "epix.com" in the same category (as defined by the United States Patent and Trademark Office) as defendant's trademark registration. On those bases, the court granted summary judgment in favor of plaintiff, on November 20, 1997. *Interstellar Starship Services, Ltd. v. EPIX, Inc.*, 983 F.Supp. 1331 (D.Or.1997). Defendant appealed. The Ninth Circuit, finding that this court erred when it decided factual issues in a summary judgment, reversed and remanded for trial. *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107 (9th Cir.1999).

On January 27, 2000, defendant moved for leave to add a claim under the newly enacted federal Anti-cybersquatting and Consumer Protection Act ("ACPA"), Pub. L.No. 106–113, §§ 3001–3010, 113 Stat. 1537, 537–43 (1999), codified at 15 U.S.C.

---

1. For additional background information, see *Interstellar Starship Services v. EPIX, Inc.*, 983 F.Supp. 1331, 1332–33 (D.Or.1997).

§ 1125(d)(1999). Leave was granted and defendant filed an Amended Answer and Counterclaim on February 10, 2000. In addition to injunctive relief, defendant seeks lost profits, attorney fees and costs, $100,000 statutory damages under the ACPA, $10,000 statutory damages for Oregon trademark registration infringement, and treble damages for willful infringement by plaintiff and Tchou.

This case was transferred from Judge Frye to Judge Jones on March 1, 2000. On May 22, 2000, after plaintiff's former counsel failed to keep a firm trial date for the second time, the court ordered plaintiff to transfer ownership of the "epix.com" web site to defendant pending a final resolution of this dispute. Plaintiff subsequently added a request for return of the "epix.com" domain name to its prayer for relief.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1338(a), 28 U.S.C. § 2201, and 28 U.S.C. § 1367(a). Venue is proper in this District under 28 U.S.C. § 1391(b) and (c).

## DISCUSSION

A. *Standard*

■ In actions for infringement and dilution, plaintiff (in this case defendant-counterplaintiff, Epix, Inc.) has the burden of proof. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3rd Cir.2000). Once a plaintiff carries that burden, to receive damages the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement. The burden then shifts to the defendant to demonstrate what portion of its profits are not traceable to the infringement. *Cook v. Robbins*, 232 F.3d 736, 741 (9th Cir.2000). The Lanham Act permits an award of attorneys' fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). Generally, a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful. *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir.2000). The court may also award, in cases of willful infringement, up to three times plaintiff's damages or three times defendant's profits, subject to the principles of equity. 15 U.S.C. § 1117(a).

B. *Trademark infringement (15 U.S.C. § 1114(1)(a)), unfair competition (15 U.S.C. § 1125(a)), and Oregon trademark infringement (ORS 647.095)*

■ A claim for federal trademark infringement may be brought against any person who shall, without the consent of the holder of the registered trademark,

> use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive;

15 U.S.C. § 1114(1)(a). The test for unfair competition and Oregon trademark infringement is exactly the same as for trademark infringement, that is "whether the purchaser is likely to be deceived or confused by the similarity of the marks." 184 F.3d at 1110.

Plaintiff does not dispute that defendant owns the registered trademark "EPIX," which was registered on the Principal Register of the United States Patent and Trademark Office ("PTO"), in Class 9, for "printed circuit boards and computer programs for image acquisition, processing, display and transmission," in October, 1990. Ex. 35. Nor does plaintiff dispute that defendant registered its "EPIX" trademark with the State of Oregon, for goods and services related to "printed circuit boards, electronic components and computer programs for image acquisition," on June 17, 1997. Ex. 206. At no time did defendant give plaintiff or Tchou permission to use the "EPIX" trademark.

In determining the likelihood that consumers will mistakenly associate plaintiff's web site with defendant's trademark, the court considers the eight so-called "Sleekcraft factors":[2]

   (1) similarity of the conflicting designations;

   (2) relatedness or proximity of the two companies' products or services;

   (3) strength of the "EPIX" mark;

   (4) marketing channels used by both parties;

   (5) degree of care likely to be exercised by purchasers in selecting goods;

   (6) plaintiff's intent in selecting its mark;

   (7) evidence of actual confusion;

   (8) likelihood of expansion in product lines.

*AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). The court will discuss the evidence related to each factor, below.

### 1. *Similarity of the conflicting designations*

Tchou testified that "epix.com"[3] is readily distinguishable from defendant's trademark. He claims that he does not use the term "epix" without the ".com" suffix, and that the suffix imparts a different meaning. Further, Tchou pronounces "epix" with a long "e" sound, whereas defendant pronounces the word with a soft "e", as in the plural of "epic".

The differences Tchou relies on are not readily discernable to the reasonable consumer. Pronunciation is indistinguishable in printed advertisements. Furthermore, the reasonable consumer has no way of knowing from its web address that plaintiff desires to be known as "epix.com" and not as "EPIX." Because domain names are not case-sensitive, distinctions between "EPIX" and "epix" are also illusory. The court finds that plaintiff's and defendant's trademarks are very similar.[4]

### 2. *Relatedness or proximity of the two companies' products or services*

Defendant markets a wide array of products related to image acquisition, processing, display and transmission. Defendant's primary business is designing, testing and marketing of "frame grabbers,"— printed circuit boards that allow a computer to capture, digitally process and display images from video cameras and other sources. Defendant also writes software, which it sells separately or packages with its imaging hardware. Defendant usually sells its circuit boards as an aftermarket upgrade for personal computers, although defendant also occasionally sells computers pre-packaged with its hardware.

Defendant provides consulting services and imaging services ancillary to its prod-

---

**2.** Plaintiff argued that it was not subject to the Lanham Act because it does not use "epix.com" as a mark and because it did not use the "epix.com" web site in commerce. The court rejects both assertions. Plaintiff's six-colored logo, bearing the name "EPIX.COM" in stylized, uppercase letters, and affixed to stationary, printed pictures and web pages at the "epix.com" site clearly constitutes a trademark. Plaintiff's use of the "epix.com" web site to promote the Clinton Street Theatre, and his intent to develop his site into a money making Internet portal site constitute commercial uses under the Lanham Act. *See Panavision Intern., L.P. v. Toeppen,* 141 F.3d 1316, 1327 (9th Cir.1998).

   Plaintiff also argued that the court did not need to consider the Sleekcraft factors because defendant's products are unrelated to plaintiff's and, therefore, not susceptible to confusion. The evidence presented demonstrated similarities in services offered by plaintiff and defendant sufficient to warrant application of the Sleekcraft factors. *See Interstellar Starship,* 184 F.3d at 1110.

**3.** Internet browsers and other applications consider upper- and lowercase letters in a domain name to be the same. Consistent with the convention used by the Netscape and Internet Explorer web browsers, the court will refer to domain names using all lower case letters.

**4.** Besides the similarity of the web address and the "EPIX" mark, some of the web pages at "epix.com" feature text in front of a grey wallpaper displaying plaintiff's "EPIX.COM" oval logo. Ex. 132. Defendant also uses grey wallpaper as a backdrop for its web pages.

uct sales. Epix engineers perform on-site evaluations of potential client's software and hardware needs. Defendant designs and tests new hardware for others on a case-by-case basis. Defendant has also provided image processing services upon customer request.

It is difficult to say what products and services plaintiff offered at its web site. Plaintiff did not explicitly offer any goods or service for sale, although one web page claimed that the web site was used for business purposes. Ex. 129A. The site has some characteristics of a serious business venture and some characteristics of a personal scrapbook.

Without doubt, the "epix.com" web site was used to display pictures of actors from the "Clinton Street Cabaret" dressed as characters from the Rocky Horror Picture Show.[5] The web site included a calendar of events and other information of interest to devoted fans.

Tchou also used the "epix.com" site to promote himself. Several pages displayed photos of identification badges that he made for members of the Clinton Street Cabaret and a rival acting group, "Sibling Rivalry." Those badges bear his six-colored "EPIX.COM" logo in the lower right-hand corner.

Tchou published a web page entitled "Questions and Answers to epix.com" containing what could be considered a promotion of his badge-making capabilities. That page provided:

Question # 3

-How were the 19th and 20th Cabaret badges made?

Answer # 3

-Original photos of the 19th and 20th Cabaret casts were taken (at different times) with regular print (color negative)

film. Color (positive) 35mm transparencies were produced by Dale Labs in Hollywood, Florida. * * * Scanning of the 35mm positive transparencies was done using a Nikon LS 3510AF. Original scans were made at high enough resolution to produce a 9.5 MByte data file for each head & shoulders portrait. All graphic artworks, including head & shoulder portraits, were assembled using Adobe Photoshop 3.04.

Final front and back pieces for the 19th Cabaret were printed on a Tektronix Color Phaser dye-sublimation printer ... using ultra-smooth plastic-impregnated paper ... at 350 dots-per-inch resolution.

* * * * * *

Average amount of time to produce an individual badge is approximately 2 hours. Average cost to produce an individual badge (including photo shoots and raw material) is approximately $5.00.

Ex. 132.

Tchou included descriptions of his image capture and display capabilities elsewhere on the site. At least one page on his web site described his use of proprietary software to produce the images displayed at his site:

Trivia: Original photos were taken with regular print (color negative) film. Color (positive) transparencies were made by Dale Labs in Hollywood, Florida. Scanning (of the transparencies) was done using a Nikon LS–3510AF. Original epix were scanned at 9.5 MBytes resolution. After-scan digital image processing was done using Adobe Photoshop 3.04 and *proprietary epix.com pixel manipulation (bit-twiddling) tools.*

Ex. 139 (emphasis added).[6]

An early version of a page linked to the "epix.com" strike page[7] contained auto-

---

5. For the "uninitiated" reader, the Clinton Street Cabaret gives live performances of the Rocky Horror Picture Show in front of the movie screen and in the theater aisles while the movie plays on the screen. The Cabaret performs at the Clinton Street Theatre, located in Portland, Oregon, on the first and third Saturdays of every month. Audience mem-

bers participate in the experience by joining in the dialog, and by acting out the movie in the theater aisles. The Theatre recently celebrated 22 years of uninterrupted Saturday night Rocky Horror Picture Show screenings.

6. Tchou explained that "pixel manipulation" refers to the process of varying the appear-

biographic information and made numerous references to Tchou's experience with computer hardware, software and graphics. Paragraphs 4–7 of that page provided:

> For those of you who are interested in such things, this is the second USA corporation to operate under the name of ISS Limited. The first ISS Ltd was incorporated in New Hampshire, USA. *That (the original ISS) company provided personnel and services, on a contract basis, to high-tech firms* located in and around the Boston, Massachusetts area.
>
> *The original ISS Ltd specialized in the development of hardware and software for use by companies involved in the computer graphics (and electronic imaging) industry.* The first ISS Ltd had a strong relationship with Raster Technologies. Raster Tech invented and marketed the "Model One" series of high-speed high-resolution graphic controllers.
>
> Although Raster Technologies no longer exists as an independent company, *many of the technical advances developed at Raster Tech (some by ISS Ltd personnel) are still in use today.*
>
> The *EPIX.COM web presence server is used mainly as a temporary storage location for products (binary files) produced by engineers at ISS Ltd to fulfill our customer's needs and specifications. These files might be software, source code, images, data, or any of a number*

*of intangible goods that can be represented as files on a computer.*

Ex. 129A (emphasis added).

Tchou denies that the text, above, was ever displayed at his web site. He testified that he has a policy of numbering successive versions of his files "[name]–000", "[name]–001", and so on. Based on this policy, he believes that the "hb–000.htm" file that contained the above text was his first draft, and was never linked to his strike page. He believes that someone from defendant recognized his naming convention and rummaged through unpublished web pages that were stored on his web server.[8]

Defendant's assistant counsel, Mr. Sheldon Epstein, and defendant's president, Dr. Dreizen, both controverted Mr. Tchou's testimony. Both testified that they visited the "hb–000.htm" page using a link from plaintiff's strike page. Dr. Dreizen also viewed the source code[9] of the "epix.com" strike page, "index.htm," as it was displayed on the web in July, 1997. That strike page contained a link to the web page entitled "hb–000.htm."

The displayed text of page "hb–000.htm" implies it was published, even if it was not finalized. The third line from the bottom of page states:

> This page is still under construction. (Sorry about that!) Please try again in a week or two.

Ex. 45. This text was visible with the rest of that page's text and shows Tchou's intent that this page be viewable in its current form, contrary to Tchou's testimony.[10]

---

ance of a digitally rendered image. "Bit twiddling" refers to excessive, compulsive pixel manipulation.

7. According to Tchou, the term "strike page" refers to the first page an Internet user views when he enters a web site. The strike page contains links to other web pages to which the owner intends to provide public access.

8. A person may access a non-linked web page by entering the exact directory path and filename in the "location" field of a web browser, provided that the web host has not installed security measures to prevent such access.

9. Dr. Dreizen explained that the web page source code instructs the web page browser software how to display a web page and also contains links to other web pages. Links to other pages contain the name of the linked file in a link statement. He also explained that web page browsers display the web page view by default, but that anyone may view the source code of a web page by selecting that option from the browser menu.

10. The court finds Tchou not entirely credible, based on his past actions in this matter. Tchou's attorney submitted an application to the PTO for the trademark "EPIX" in Class 16, "computer graphics designs," and Class 42, "computer graphics design services," in

The court rejects Mr. Tchou's assertions and finds that the "hb–000.htm" file was linked to the "epix.com" strike page from some time after January 30, 1997, until September, 1997.

In summary, the court finds that Tchou used "epix.com" to promote his services in video image processing and in hardware and software design. Those services are similar to services offered by defendant and marketed under its trademark. Page "hb–000.htm" represented that the "epix.com" web site was used to store "software, source code, images, data" or "any number of intangible goods" for its customers. These services and products are, at least superficially, the same services offered by defendant, under its registered mark. Plaintiff's reference to "bit twiddling using proprietary epix.com software" creates the distinct impression that "epix.com" sells image processing services, software and/or graphic arts.[11]

Notwithstanding the court's findings, above, the court also finds that the primary products associated with the "epix.com" web site are pictures, biographies of actors, and a calendar of Clinton Street Theatre-related activities. Those products are not related to any product or service offered by defendant.

### 3. Strength of the "EPIX" mark

■ A strong mark is entitled to broad protection, whereas a weak mark warrants protection only when a competing mark is "quite similar" and the goods are "closely related." *Westward Coach Manufacturing, Co., v. Ford Motor Co.,* 388 F.2d 627, 634 (7th Cir.1968); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1058 (9th Cir.1999). Fictitious, arbitrary or fanciful expressions make strong marks. Suggestive or descriptive marks are presumptively weak, but may become strong where, through advertising, a mark achieves marketplace recognition. *Brookfield,* 174 F.3d at 1058. The parties disagree on the strength of the "EPIX" mark.

Dr. Dreizen testified that "EPIX" is a fanciful term selected by his company's founders who wished to choose a name that had no prior use or association with any goods or entities. Tchou testified that the term "epix," and its variations "e-pix" and "e-pics," are widely used as a descriptive term meaning "electronic pictures." The evidence established that "epix" is used both fancifully and descriptively by numerous individuals and businesses.

A trademark search by plaintiff, in October, 1996, revealed at least eight other valid PTO registrations of "EPIX" or a close variation.[12] The presence of so many similar trademarks lessens the likelihood that consumers will strongly associate the mark with defendant.

November, 1996. In that application, he swore that he had no knowledge that anyone else had the right to use the mark "EPIX" in connection with the offering of goods or services likely to cause confusion with his mark. During the trial, however, Mr. Tchou admitted that he became aware of defendant's trademark, and its challenge to his "epix.com" domain name, in October, 1996. Tchou also admitted at trial that his former counsel told this court and the Ninth Circuit that Tchou used his web site only for charitable purposes. Mr. Tchou knew that this misrepresented his intent to get rich using "epix.com" as an Internet portal for electronic pictures, yet he made no attempt to correct the record.

11. Tchou himself admitted that, while he sees "bit twiddling" as distinct from image processing, industry standard usage of the term "image processing" encompasses "bit twiddling" and "pixel manipulation."

12. Trademark registrations of EPIX included: (1) "EPIX Eastern Pennsylvania Internet Exchange," registered in "Miscellaneous Service Marks", "Advertising and Business Services" and "Communications Services" (pending); (2) "EPIX," registered in "Games, Toys & Sporting Goods" and "Clothing"; (3) "EP/IX," registered in "Prints and Publications"; (4) "EPIX XL," registered in "Dental, Medical & Surgical Appliances"; (5) "EPIX," registered in "Furniture & Upholstery"; and (6) "EPIX," registered in "Dental, Medical & Surgical Appliances"; (7) "EPIX +," registered in "Dental, Medical & Surgical Appliances"; and (8) "EPIX," registered in "Advertising and Business Services". Ex. 101.

Searches for "EPIX" on the Internet reveal numerous descriptive uses of the term as well, including: "E-pix," an electronic image archive service offered by The Canadian Press; "e-pix," a photo service offered by J C Penney, Inc.; "e-Pix Party Kit," a digital camera and processing service offered on the Internet.

Dr. Dreizen testified that defendant continuously and diligently defends its trademark. At least three potential infringers, Amtel Systems, Inc. of New Hampshire, EPIX, Inc. of Cleveland, Ohio, and EPIX Imaging Systems, Inc. of Santa Clara, California, ceased using the "EPIX" mark after defendant threatened legal action. Despite defendant's efforts, however, dozens of companies using EPIX or similar marks may be easily found on the Internet by searching on "epix" or similar terms.[13] Given the proliferation of "e"-words in the vernacular during the last five years, e.g. "e-tail", "e-zine", "e-mail", descriptive uses of the term and its variations seem likely to continue to grow. Accordingly, the court finds that "EPIX" is a relatively weak mark.

4.  *Marketing channels used by both parties*

The likelihood of confusion increases with the overlap in marketing channels utilized by plaintiff and defendant. In this case, plaintiff and defendant maintain web sites with similar names but they do not actively market to the same consumers or through the same channels. Defendant places advertisements in specialty trade journals, sends direct mailings to former customers and customers of related businesses, and staffs tables at trade shows in the United States. Defendant's printed literature promotes the "epixinc.com" web site, which provides technical information and pricing. Defendant does not maintain

banner or pop-up advertisements at web sites operated by others.

Except for printing his "EPIX.COM" logo on approximately 100 identification badges, plaintiff has not actively promoted the "epix.com" web site. Tchou testified that some other web sites dedicated to the Rocky Horror Picture Show contain links to his site, but he has never placed advertisements on other sites, mailed advertisements, or promoted his site at trade shows.

Given the facts above, the court finds little or no overlap in marketing channels of plaintiff and defendant. Because defendant markets through limited channels and plaintiff does not actively market its site, potential customers of defendant are extremely unlikely to receive any advertisement of plaintiff's mark, and vice versa.

5.  *Degree of care likely to be exercised by purchasers in selecting goods*

The law presumes that persons seeking expensive goods and services will exercise more care and be less easily confused by similar marks than persons seeking inexpensive goods and services. The law also presumes that confusion about the source of advertisements is less likely when the advertised goods are marketed primarily to expert buyers. *Brookfield,* 174 F.3d at 1060.

Defendant markets only expensive goods. Dr. Dreizen testified that his company advertises a few dozen products, ranging in price from $395, for its "PIXCI" PCI card, to over $2,000 for its high-end hardware. His company has offered products costing up to $15,000 in the past; it has never offered products for less than $395.

Defendant markets its goods primarily to expert buyers. Dr. Dreizen testified that his company places advertisements in

---

**13.** Other uses of the name include: "EPIX Medical," which markets medical imaging equipment and uses the NASDAQ symbol "EPIX"; "Epix Records," a recording label; "E–PIX NEWSSTAND", an Internet comics web site; "Epix 3d Graphics", a web site located in Norway; "eppix", offering customized graphics services via the Internet; and "EPIX Belgian Sheepdogs". Ex. 24. Depending on the search engine used, an Internet search on "EPIX" yielded between 70 and 166,000 hits at the time of this trial.

trade journals, including DALSA and VISION SYSTEMS DESIGN. Until recently, his company published its own newsletter titled "EPIX Vision", which bore the tag line "Image processing products for research and industry" and contained technical articles clearly targeted at a sophisticated audience.[14] Although defendant no longer publishes its newsletter, its web site retains the former newsletter's tag line. Dr. Dreizen testified that hobbyists also purchase his products, but he was unable to quantify such customers. He conceded that most purchasers of his company's products work for research institutions and large companies. Given the high price of defendant's products and the sophistication of its customers, the court finds that customers of defendant are likely to exercise a high degree of care.

### 6. Tchou's intent in selecting "epix.com"

The registration of a domain name with knowledge that the second-level domain name[15] is another company's trademark weighs in favor of the likelihood of confusion. 174 F.3d at 1059. Defendant presented circumstantial evidence that Tchou was aware of its trademark when he registered "epix.com": Tchou, an electrical engineer, specializes in printed circuit board design. Some of his circuit board expertise was acquired working on image processing hardware and software similar to defendant's products. At the time he registered "epix.com," Tchou had worked as a chip designer in New England, at AT & T and at Lattice Corporation. Tchou represented, on a page at his web site, that he has broad experience and expertise in image processing and circuit board design.

All of this evidence raises a reasonable inference that Tchou acquired knowledge of defendant's products and trademark at some time before January, 1995. However, the circumstantial evidence is not compelling in light of the following: Defendant employs only eleven people, and only sells high end video image processing computer hardware. Defendant's hardware is a specialty product, even within the image processing industry. Defendant sells its hardware primarily to university and industrial researchers. Between 12 and 24 other companies manufacture circuit boards similar in design and function to defendant's. Tchou never designed frame grabber hardware, despite his related work experience. Tchou conducted a web search on "epix" before he registered the domain name, but did not find defendant because defendant had no presence on the web at that time.

In light of these additional facts, it is very plausible that Tchou had no prior knowledge of defendant's trademark. Tchou had his own reasons for registering "epix.com". He had heard the term "epix" used as shorthand for "electronic pictures" and realized that "epix.com" was a good descriptive name for a web page that featured displays and links to displays of electronic pictures. Tchou hoped to evolve his site into a widely known Internet portal site, like the now-famous "Yahoo.com" web site, but with a special emphasis on electronic images.

Tchou's failure to grow his web site into a profitable business does not demonstrate bad faith. On the contrary, his investment of time and money into the "epix.com" site, his continuous use of the domain name as a web site, and the descriptive value of the name "epix.com" for his purposes all tend to prove Tchou's good faith. While Tchou admitted that he was aware that others would covet the name "epix.com," that awareness, by itself, does not deprive Tchou of the right to put the name to his own legitimate use.[16]

---

14. For example, the July, 1994 issue featured an article titled "NASA Quantifies Soot Content of Flame Using Laser & Imaging Techniques." Ex. 38.

15. "epix" is the second level domain name of "epix.com."

16. Tchou testified that persons who broker Internet domain name sales told him that the shortness of the name, the first letter "e" (which people associate with the Internet), and the name's descriptive meaning all tended to make it more valuable. He also testified that he entered the word "epix" in a search

Defendant also alleges that Tchou acted in bad faith when he continued to use his "epix.com" site after receiving notice of possible confusion with defendant's mark. Defendant alleges that Tchou intended to aid defendant's competitor, Intel, Inc., by preventing defendant from using the "epix.com" domain address.

Defendant again relies on speculative evidence: In the mid–1990s, Tchou worked as a contract employee performing "signal integrity work" for Intel Corporation in Beaverton, Oregon. At that time, Intel did business with defendant and also marketed video imaging hardware that competed with some of defendant's products.

The theory that Tchou intentionally deprived defendant of its desired domain name because doing so would hamper defendant's ability to compete with Intel is far-fetched and the court is not persuaded. Tchou's work for Intel pertained to laptop computers; the Intel plant where Tchou worked did not design or manufacture frame grabber products. The court finds that Tchou's involvement in this trademark dispute during the time he did work for Intel is coincidental, and nothing more.

### 7. Evidence of actual confusion

Defendant presented summaries of its comparison of "epixinc.com" server logs to "epix.com" server logs, showing common user traffic at the two sites. Ex.'s 197, 198. Dr. Dreizen wrote a computer program that compared user entries found in both server logs. His comparison shows that, between December 1996 and June 1997, at least fifty different web browsers contacted both sites. Ex. 197.

Dr. Dreizen's comparisons do not prove actual confusion regarding the affiliation of the marks.[17] One cannot discern from the logs how many of the mistaken queries on the "epix.com" site resulted from incorrect listings of defendant's web address in published advertisements and articles about the company.[18] Confusion resulting from these incorrect listings is not proof of infringement.

The fact that some of defendant's potential customers go to "epix.com" by mistake because they hazard a guess that defendant owns the site also does not demonstrate actual confusion. Today's Internet user knows that search engines, such as "Hotbot," "Lycos," and "Google," provide a quick, free and reliable way to locate a business' web site when its exact Internet address in not known. Nevertheless, many users will still try "[company name].com" before using a search engine because there is little effort and no cost to anyone in making a guess.

The Ninth Circuit has held that the initial confusion caused by the presence of another's trademark in a domain name may be actionable under the Lanham Act. See Brookfield, 174 F.3d at 1063; Interstellar Starship, 184 F.3d at 1111. However, Brookfield involved bad faith—the defendant had deliberately placed plaintiff's trademark in non-viewable locations on its web site so that search engines would list his site in the results of searches done on plaintiff's mark.

■ Cases in other circuits have also required bad faith as a component of actionable initial interest confusion involving Internet domain names. See Hasbro, Inc.

---

engine before he registered the name, and received many "hits" on the word. Besides the likelihood that someone already using the word might offer to buy it from him, Tchou believes that words that are used frequently on the Internet are more valuable because they increase the likelihood that a casual browser will wander to the site.

**17.** Defendant's only proof of actual confusion was a letter from a customer stating that, after he had reached plaintiff's web site by

mistake, he became confused by that page's link to plaintiff's other web site, "vpix.com". When he realized the "vpix.com" site also belonged to plaintiff, he then conducted a name search and found the "epixinc.com" web site. Ex. 113.

**18.** Dr. Dreizen conceded that at least three trade magazines mistakenly published defendant's web address as "www.epix.com", although the majority of references to defendant contained the correct address.

*v. Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir.2000) (where trial court found very little similarity between plaintiff's and defendant's products, proof that a few Internet surfers looking for plaintiff's site had stumbled upon defendant's site did not merit trial court's consideration of "initial interest confusion." *Id.*); *Niton Corp. v. Radiation Monitoring Devices, Inc.*, 27 F.Supp.2d 102, 104–05 (D.Mass.1998) (court's issuance of preliminary injunctive relief based on the fact that defendant was purposefully diverting people looking for Niton to its web site).

In this case, where plaintiff registered the "epix.com" domain name without knowledge of defendant's trademark, he could not have intended to benefit in bad faith. Defendant failed to prove actual confusion or initial interest confusion actionable under the Lanham Act.

8. *Likelihood of expansion in product lines*

Tchou testified that he would like to evolve the "epix.com" site into an Internet portal for the display of "specialty pictures." Defendant has no current plans to expand into new markets.[19] The court finds that defendant is unlikely to expand its current products into the fields of graphic arts or graphic arts design and that plaintiff is unlikely to use "epix.com" to sell computer hardware.

■■■ Except for the strong similarity between plaintiff's and defendant's marks, the remaining Sleekcraft factors all favor plaintiff. Plaintiff's primary use of the "epix.com" web site is unrelated to goods and services offered by defendant. The "EPIX" mark is not particularly strong

nor is it famous. Plaintiff and defendant do not market their products to the same consumers and defendant's consumers exercise a high level of care when purchasing its products. Plaintiff was not aware of defendant's mark when it registered "epix.com," and defendant produced minimal evidence of actual confusion. Finally, the parties are not likely to expand into each other's markets in the foreseeable future. *See Brookfield*, 174 F.3d at 1060.

Accordingly, the court finds that plaintiff's use of the "epix.com" web site, as a showcase for actors of the Clinton Street Cabaret and for display of information related to the Rocky Horror Picture Show, will not infringe on defendant's trademark provided plaintiff omits all promotions of Tchou's technical services and omits all technical references to video image processing.[20] By eliminating these incidental uses, plaintiff will distinguish its product enough to avoid any likelihood of confusion with defendant.

■■■ The court also finds, however, that plaintiff's publication of web page "hb-000.htm", references to "bit-twiddling" or "pixel manipulation", use of gray wallpaper, and use of the "EPIX.COM" logo, taken together, created an impermissible likelihood of consumers affiliating "epix.com" with defendant's registered mark. The court finds no evidence of profits to plaintiff or losses to defendant related to plaintiff's infringement. The court will address the appropriate remedy for this incidental and unintentional infringement after considering defendant's remaining claims.

19. If defendant wished to expand into related markets, it would expose itself to potential liability, owing to an earlier agreement with Epic Data, Inc. Defendant entered into a settlement agreement with Epic Data, Inc, in 1989, in order to settle a dispute over use of the "EPIX" mark. In that agreement, defendant promised to "now and at all times in the future use the mark EPIX only in conjunction with printed circuit boards and computer programs for image acquisition, processing, display and transmission." Ex. 37.

20. The court cannot judge, in the abstract, whether Tchou's contemplated use of the site to display other kinds of electronic images at some future date is likely to cause consumers to confuse or associate that site with defendant or its products. However, the court would be inclined to conclude that the likelihood of confusion, in that event, could be eliminated by a disclaimer on plaintiff's strike page stating that it is not affiliated with defendant in any way.

B. *Oregon trademark dilution*

■ Defendant seeks injunctive relief under Oregon law, alleging that plaintiff has diluted its registered mark. At common law and by statute, if a trade name is distinctive, it is entitled to protection to the extent imitation of that name causes, or is likely to cause, confusion in the market about source of goods or services. *Ernst Hardware Co. v. Ernst Home Center, Inc.*, 134 Or.App. 560, 895 P.2d 1363, 1365 (1995).[21]

In order for a mark to be "distinctive" in the context of dilution protection under Oregon law, plaintiff must prove its "favorable associational value in the minds of consumers." *Wedgwood Homes, Inc. v. Lund*, 294 Or. 493, 659 P.2d 377, 380 (1983). This requires "an actual showing that the mark has come to signify defendant's product in the minds of a significant portion of Oregon consumers and that the mark evokes favorable images of defendant or its product." *Id.* (plaintiff made showing by presenting survey evidence of high association between the words "Wedgwood" and "Homes" in the minds of Oregon consumers. *Id.* at 381).

Defendant produced no evidence of local fame or recognition of the "EPIX" mark.[22] Nor did defendant offer evidence that it marketed its products to Oregonians. *See Wedgwood*, 659 P.2d at 380 (advertising programs in the market area provide evidence of mark's fame). Defendant conceded that it has never advertised its product in Oregon newspapers, or through any other channel calculated to reach Oregon consumers. Because defendant has failed to prove any association between its trademark and its products, its dilution claims must fail.

C. *Cybersquatting*

■ Defendant finally alleges that plaintiff registered the "epix.cc"[23] domain name in violation of the Anti-cybersquatting Consumer Protection Act ("ACPA"). 15 U.S.C. § 1125(d). That statute took effect November 29, 1999, and provides:

A person shall be liable in a civil action by the owner of a mark * * * if that person

(i) has a bad faith intent to profit from that mark * * *; and

(ii) registers, traffics in, or uses a domain name that—

(I)In the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

15 U.S.C. § 1125(d)(1)(A). The statute lists nine factors a court may consider in judging bad faith intent. § 1125(d)(1)(B)(i). While a court may find liability, it cannot assess damages for registration, trafficking, or use of a domain name that occurred before the ACPA took effect. *Sporty's Farm L.L.C. v. Sportsman's Market*, 202 F.3d 489, 500 (2nd Cir.2000).

This case has an unusual twist in that plaintiff denies it ever registered the "epix.cc" domain name. Dr. Dreizen testified he performed a "whois"[24] search on December 28, 1999, which revealed that

---

21. Oregon's antidilution statute provides:
   Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under ORS 647.015, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
   ORS 647.107.

22. In fact, defendant did not establish the fame of the mark in any market or geographic area.

23. eNIC Corporation, of Seattle, Washington, markets ".cc" domain names as an alternative to ".com" names when the ".com" version of a desired name is not available. A ".cc" name functions the same as a ".com" name in every way.

24. eNIC provides the "whois" search at its home page. Using this automated on-line service, a person may enter a ".cc" domain name and obtain basic information about the entity that registered the name.

plaintiff had registered the site. Ex. 117. Dr. Dreizen also testified that, in December 1999, he entered the address "epix.cc" in his browser and arrived at plaintiff's strike page. Plaintiff produced deposition testimony from Louise Loebel, Director of Operations at eNIC Corporation, the company that administers ".cc" domain name registrations. Ms. Loebel testified that eNIC had no record of plaintiff ever registering the name "epix.cc."

Whether or not plaintiff registered "epix.cc," this court will not award damages based solely on the act of owning the "epix.cc" name after November 29, 1999.[25] *See Sporty's Farm,* 202 F.3d at 500. Dr. Dreizen conceded that Tchou never offered to sell defendant the "epix.cc" name.[26] If Tchou had intended to profit from selling the "epix.cc" name, it is clear that he abandoned that intent after the ACPA took affect. Furthermore, defendant registered the name in January, 2000, mooting the need for injunctive relief. Accordingly, defendant's cybersquatting claim is denied.

### CONCLUSION

The court finds that plaintiff's present use of the "epix.com" web site to display electronic pictures and other information related to the Rocky Horror Picture Show does not infringe on defendant's "EPIX" trademark. The court, therefore, orders defendant to transfer the domain name to plaintiff within sixty days.

However, the court finds that plaintiff's past use of "epix.com" in conjunction with the promotion of Tchou's technical services and digital image processing did infringe on defendant's trademark. Therefore the court enjoins plaintiff from using the "epix.com" site for those purposes. The court also enjoins plaintiff from using gray wallpaper, and from using its

25. The whois search reports that plaintiff registered the name "epix.cc" on May 22, 1999.

26. Evidence that Tchou offered to sell defendant the "epix.com" name as part of a settlement is distinct from an offer to sell "epix.cc."

"EPIX.COM" logo at the "epix.com" web site, unless plaintiff also provides an annotation, explaining that "epix.com" is not affiliated with defendant, on each page displaying the "EPIX.COM" logo.[27]

Defendant's claims for trademark dilution and cybersquatting are DENIED.

Each party shall bear its own costs and attorneys fees.

27. The precise terms of injunctive relief are contained in a separate Order issued contemporaneously with this Opinion.